UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DONNA R. SANTIFORT,<br>　　　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>SUE GUY, in her personal capacity; LEE SMITH, in his personal capacity; JOE GURLEY, in his personal capacity; and STEVE KEEN, in his personal capacity; and COUNTY OF WAYNE, NORTH CAROLINA;<br>　　　　　　　　　　Defendants. | Civil Action No. 4:14-cv-00225-F |

## AMENDED COMPLAINT

NOW COMES Plaintiff Donna R. Santifort, by and through the undersigned counsel, complaining of the Defendants and saying that:

1. Plaintiff Donna R. Santifort ("Santifort") is a citizen and resident of Lenoir County, North Carolina.

2. Defendant County of Wayne, North Carolina ("the County") is a local government entity, which has jurisdiction in Wayne County, North Carolina, and who employed Santifort during the time period relevant to this Complaint.

3. Defendant Sue Guy ("Guy") is the former Human Resources Manager of the County's Office of Emergency Medical Services ("OEMS"). Guy is, upon information and belief, a citizen and resident of Duplin County, North Carolina and is under no legal disability.

4. Defendant Lee Smith ("Smith") is the former County Manager for the County and is, upon information and belief, a citizen and resident of Chatham County, Georgia and is under no legal disability.

5. Defendant Joe Gurley ("Gurley") is a former employee of the County and is now a County Commissioner for the County who, upon information and belief, a citizen and resident of Wayne County, North Carolina and is under no legal disability.

6. Defendant Steve Keen ("Keen") is a former County Commissioner for the County and is, upon information and belief, a citizen and resident of Pitt County, North Carolina and is under no legal disability.

## SUBJECT MATTER JURISDICTION

7. The actions of Defendants are alleged to have violated provisions of the First and Fourteenth Amendments of the United States Constitution, made actionable pursuant to 42 U.S.C. § 1983, which fall under the original jurisdiction of the federal courts, pursuant to the provisions of 28 U.S.C. § 1331.

8. The included state law claims are so related to the claims under the provisions of the First and Fourteenth Amendments to the United States Constitution that they form the same case or controversy. Therefore, this Court has supplemental jurisdiction over said state law claims, pursuant to the provisions of 28 U.S.C. § 1367.

## FACTS

9. On 31 July 1991, Santifort was hired at the City of Goldsboro Fire Department as a full time EMT-Basic.

10. In 1992, Santifort completed and passed her required advanced level of EMT-Intermediate.

11. In October 2012, Wayne County EMS took over Goldsboro City EMS personnel.

12. There began to be widespread unrest amongst Wayne County EMS personnel concerning payroll issues in approximately May of 2012, when the County switched to a payroll system maintained by Ceridian.

13. In June of 2012, Santifort began receiving emails and phone calls from co-workers about their problems with their paychecks approximately June 2012

14. On or about 13 September 2012, Santifort received a letter from the County of Wayne stating she owed the County $2,630.68 due to an alleged overpayment in her paychecks for the months of July and August of 2012. The 13 September 2012 letter went on to state that Lee Smith, the then County Manager, had elected to forgive $200.00 of the amount owed.

15. Santifort and other of the County's EMS workers took their issues with the payroll system and overtime compensation to each superior in their chain of command prior to ever speaking to the County Commissioners. Among those to whom these "payroll issues" were

taken were Guy, Gurley, Albert Jones, Angie Maddux, Jason Gray, Brian Smith, Keen, Commissioner Ray Mayo, Sandra Blizzard, and Nannette Sutton.

16. The first County Commissioners meeting at which Santifort spoke on behalf of the County's EMS employees was on 18 September 2012. The subject matter of her speech was the problems with the payroll system and overtime compensation for the County's EMS workers.

17. On 18 September 2012, Santifort received a letter thanking her for attending that day's Commissioners meeting, being a representative of Wayne Net, EMS, and 911 employees, and for bringing the Commissioners information they did not know about. The 18 September 2012 letter was signed by Smith and Guy.

18. On 26 September 2012, all Wayne County EMS B-shift employees received an email from our shift supervisor that, on the upcoming Monday, they would need to start clocking in again.

19. On 27 September 2012, Santifort met with the OEMS staff members, who wanted to advise her of what then County Commissioner Steve Keen and themselves needed her to say at the upcoming Commissioner's meeting. It was at the end of this meeting that Santifort was told in the hallway of the OEMS building by Joe Gurley to "crucify him" in reference to the then County Manager Lee Smith at the upcoming October 2nd Commissioner's meeting. It was at this time that Santifort first realized the possibility that her desire to address the payroll and overtime compensation problems was being hijacked by Keen, Gurley, and Guy to further their desire to get Smith fired as the County Manager. After this meeting, Santifort became very afraid and stressed about what was really going on.

20. On 2 October 2012, remaining focused on the inequity being worked by the County's payroll issues, Santifort spoke a second time at the Commissioner's meeting on behalf of the County's EMS employees regarding the payroll system and overtime compensation.

21. On 27 October 2012, Santifort was told on the phone by Gurley that the County Manager, Smith, had sent out an interoffice email, stating that he needed to take some time off because he felt he was on the ledge. In that telephone conversation, Gurley stated, "I hope he jumps." This frightened Santifort, because she was afraid it was indeed a suicide gesture. Santifort was concerned about Smith and emailed him late the same evening in an attempt to reassure Smith that all would be okay.

22.     From June 2012 to 28 November 2012, Santifort was under extreme stress, trying to deal with Keen, Gurley, Smith, Guy, all her co-workers, and even employees that worked for other departments in Wayne County whom she had never met. They were all calling her with their demands, concerns, fears, stories of being threatened by their supervisors if they got involved in the "payroll issue."

23.     On 28 November 2012, Santifort responded to a call that she was having a hard time getting over.  While at the scene of a car accident where the car was resting on its roof, Santifort noticed diapers, a car seat, and other things a parent would carry with a young child, spread about the roadside.  Santifort and some firefighters began looking for the child, hoping to not find the body.  Santifort had had approximately three such calls in the past, all of which were fatalities.  Ultimately, it was confirmed that the driver had just dropped off the child.  However, the time span where she and firefighters attended to the gruesome task of looking for a young child's body caused her to lose sleep, lose her appetite, and amplified the stress level already induced by the "payroll issue."

24.     On 3 December 2012, there was another Commissioner's meeting scheduled, and Santifort advised everyone that she would not be attending because she needed a break. Santifort was scheduled to work that day and felt as if she was letting everyone down by not going to the meeting. Once Santifort arrived at work, she contacted her supervisor, Angie, and told her that she had changed her mind and felt she needed to attend the meeting.  Angie agreed and told Santifort she would send someone to Santifort's station to cover for Santifort so that she could attend the Commissioner's meeting.  Once in the meeting room and while waiting for the meeting to start, Santifort told Angie about the stress she was under and how she was not dealing very well with the EMS call she responded to on 28 November 2012.  The meeting began before Angie was able to respond to Santifort.  Santifort was unable to speak at the 3 December 2012 Commissioner's meeting regarding the payroll system and overtime compensation for the County's EMS workers, because the Commissioners refused to let any County EMS employee come to the microphone to speak.

25.     The payroll system and overtime compensation issues were a matter of public concern, as is shown by the local news media attention that the intense Commissioner's meetings about said issues garnered each time in the Goldsboro News-Argus and other media outlets.

26. On 3 December 2012, after the Commissioner's meeting and back in the OEMS parking lot, one of Santifort's coworkers fell ill and collapsed. That coworker, Crystal Baldwin, suffers from a medical condition known as SVT, for which she requires medication. As she began to collapse, she directed someone else to go get her medication while Santifort held her to keep Baldwin from collapsing on the ground. While Santifort attended to her coworker, Guy walked by them, laughing and smirking. Baldwin was the first to see Guy, and she told Santifort to not let Guy come near her. Out of pure emotion, the stress of the "payroll issues" having overcome her, Santifort said to Guy: "Are you happy now, you stupid bitch, is this what you wanted"? Santifort was referring to her sick coworker, Crystal Bardin, being ill as a result of the 3 December 2014 Commissioner's meeting.

27. On 4 December 2014, Santifort went to Dr. Godwin's office. Dr. Godwin gave Santifort a note taking her out of work for thirty days accompanied by verbal instructions that Santifort was to have no contact with anyone from the County EMS during those thirty days. Santifort drove back to the OEMS building and delivered Dr. Godwin's note to her supervisor, Angie. Later that evening Santifort was contacted by her supervisor and told that the then County Manager, Smith, needed me to write a statement about what happened in the parking lot with Guy and to be in his office at 9:00 a.m. the following morning.

28. On 5 December 2012, Santifort went to meet with Smith at 9:00 a.m. Gurley, Blair Tyndall, Smith and a note taker were all in Lee's office at that time. Santifort honestly thought she was just going to hand over her statement so they could investigate what happened between Guy and Santifort in the OEMS parking lot after the 3 December 2012 Commissioner's meeting. However, Santifort was terminated, effective immediately, told that she was no longer allowed on any of the County's EMS property, and told that her things would be delivered to her. The back door of Smith's office was opened and there were two Wayne County Deputies waiting to escort her off the premises. Santifort called her supervisor, Angie, and asked that, since she had been in EMS for over twenty years, she had accumulated a lot of things and would like to gather her own items that were located throughout the station. Angie contacted supervisor Brian Smith, and Santifort was allowed to get her own items with the stipulation that her supervisor, Angie, and WayneNet supervisor, Nannette Sutton accompany her the entire time. The entire time Santifort loaded her items into her car, Angie and Nannette were sobbing. Santifort tried her best to console them.

29. After approximately 5 December 2012, Santifort heard nothing from Gurley until 25 April 2014. On 25 April 2014, however, Gurley sent Santifort a text, requesting that she tune into that morning's Commissioner's meeting. Also on 25 April 2014, Gurley called Santifort and left a voicemail, stating that there was something he needed to tell Santifort that he had been wanting to tell Santifort for the last couple of years. Santifort also had a missed call from WCEMS supervisor Jason Gray. Santifort was able to reach Jason the same day, who said he wanted to know if Santifort had heard Keen had resigned his position as a Commissioner. Santifort tried over the next couple of days to return Gurley's call and finally reached him. When she reached him, she asked what it was he wanted to tell her. Gurley replied that, "[he] just wanted to find out if it was [Santifort] or not that told [Gurley] Keen used to be a Navy Seal."

30. Santifort was used as a pawn by Gurley, Keen, and Guy to foment public unrest and negative attitude toward Smith in the hopes of accomplishing two things:

(a) Stirring up enough backlash against the Democratically controlled County Commissioners to help orchestrate a Republican takeover of that body in the November 2012 election; and

(b) Thereby creating a Board of Commissioners that had the votes to oust Smith as the County Manager.

31. Keen admitted to Santifort that the County's EMS workers were "prostituted for votes" during the "payroll issues."

32. Gurley's, Keen's, and Guy's plan to use Santifort as a such a pawn worked perfectly, as the Republicans did take over the Board of Commissioners, who subsequently fired Smith as the County Manager.

33. As of 5 December 2014, Gurley, Keen, and Guy no longer had any need for Santifort or to foment any unrest regarding the County's "payroll issues." Therefore, they were looking for any reason to terminate Santifort to quell unrest on those issues.

34. Santifort's emotional and stress-induced single outburst toward Guy served as the pretextual reason for Santifort's termination.

35. The real reason for Santifort's termination was in retaliation for her continued advocacy for a real solution to the County's "payroll issues."

36. The County's "payroll issues" was a matter of public concern.

37. Santifort was terminated as a direct and proximate result of her speech and petitioning activities with regard to the County's "payroll issues."

38. Upon information and belief, the County has waived sovereign immunity by its purchase of insurance.

39. Defendants knew or should have known that each employee is, at a minimum, permitted to, speak on matters of public concern, pursuant to the First and Fourteenth Amendments to the United States Constitution, petition government for the redress of his or her grievances, pursuant to the First and Fourteenth Amendments to the United States Constitution, and to be equally protected under the law, pursuant to the Fourteenth Amendment to the United States Constitution. Such a right was first recognized by the Fourth Circuit in employment litigation in *Kirby v. City of Elizabeth City*, 388 F.3d 440 (4th Cir. 2004), and was reiterated by the Fourth Circuit in *Andrew v. Clark*, 561 F.3d 261 (4th Cir. 2009). Those cases having existed four and three years, respectively, prior to the County's actions, a reasonable person would have known that Defendants' actions violated clearly established constitutional rights.

40. Guy, Gurley, Smith, and Keen were individuals that had the apparent authority to be ultimate decision-makers with regard to County policy and did wield such power in a de facto sense, since to challenge their actions would be to open oneself up to claims of insubordination.

## FIRST CLAIM FOR RELIEF
### First Amendment Retaliation—Freedom of Speech
### (42 U.S.C. § 1983)
### (All Defendants)

41. The allegations contained in paragraphs one through forty of this Complaint are hereby incorporated by reference as if fully set forth herein.

42. At all times relevant to this Complaint, Defendants were acting under the color of law.

43. The dismissal of Plaintiff was done in retaliation for her actions and attempts to exercise her First Amendment right to freedom of speech in that she was expressing views regarding matters of public concern.

44. Plaintiff's interest in her expression of her views outweighs whatever interest Defendants had regarding maintaining control over the workplace.

45. As a result of Defendants' retaliation against Plaintiff's expression of her views, Plaintiff lost the valuable benefit of continued employment with the County, together with other

economic and non-economic damages, including but not limited to emotion distress and mental anguish.

## SECOND CLAIM FOR RELIEF
### First Amendment Retaliation—Freedom to Petition for Redress of Grievances
### (42 U.S.C. § 1983)
### (All Defendants)

46. The allegations contained in paragraphs one through forty-five of this Complaint are hereby incorporated by reference as if fully set forth herein.

47. At all times relevant to this Complaint, Defendants were acting under the color of law.

48. The dismissal of Plaintiff was done in retaliation for her advocacy before the County Commissioners in violation of her right to petition government for redress of grievances under the First Amendment.

49. Plaintiff's interest in petitioning government for redress of her grievances outweighs whatever interest Defendants had regarding maintaining control over the workplace.

50. As a result of Defendants' retaliation against Plaintiff's petition to government for the redress of her grievances, Plaintiff lost the valuable benefit of continued employment with the County, together with other economic and non-economic damages, including but not limited to emotion distress and mental anguish.

## THIRD CLAIM FOR RELIEF
### Wrongful Discharge in Violation of Public Policy
### (North Carolina Common Law)
### (Defendant County of Wayne, North Carolina)

51. The allegations contained in paragraphs one through fifty of this Complaint are hereby incorporated by reference as if fully set forth herein.

52. Plaintiff was an at-will employee of the County.

53. Plaintiff engaged in legally protected activities.

54. Plaintiff was discharged from her employment with the County.

55. Plaintiff was discharged from her employment with the County because of her having engaged in legally protected activities.

56. As a result of being discharged, Plaintiff has lost the valuable benefit of continued employment with the County, together with other economic and non-economic damages, including but not limited to emotion distress and mental anguish.

WHEREFORE, Plaintiff respectfully prays this Court to enter judgment against Defendants granting her the following forms of relief:

1. For trial by jury as to all issues so triable;
2. Declaring the rights of Plaintiff with respect to her employment;
3. An award of the back pay owed to Plaintiff in an amount to be determined at trial;
4. An award to compensate for all non-economic damages incurred by Plaintiff, including but not limited to, the humiliation, stress, mental anguish, embarrassment, and loss of enjoyment of life suffered by Plaintiffs, in an amount no less than $100,000.00;
5. An award of nominal damages (in the alternative, if compensatory damages are not awarded);
6. An award punitive damages in an amount of $1,000,000.00;
7. An award of Plaintiff's attorney's fees;
8. That the costs of this action be taxed against Defendants; and
9. For such other and further relief as this Court, in the exercise of its sound discretion, deems just and proper.

This the **5th** day of **December**, 2014.

THE WEBSTER LAW FIRM
*Attorney for Plaintiff*

By: /s/ Walter S. Webster
Walter S. Webster, State Bar No. 38578
214 S. William St., Ste. 2
Goldsboro, NC 27530
Telephone: 919-288-2941
Facsimile: 919-882-8590
Email: walter@websterlawfirm.net