IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
Civil Action No. 4:14-CV-225-F

| | |
|---|---|
| DONNA R. SANTIFORT, </br></br> Plaintiff, </br></br> v. </br></br> SUE GUY in her personal capacity, LEE SMITH, in his personal capacity, JOE GURLEY, in his personal capacity, STEVE KEEN, in his personal capacity, and COUNTY OF WAYNE, NORTH CAROLINA, </br></br> Defendants. | **ORDER** |

Plaintiff Donna Santifort ("Santifort") sues Defendants Sue Guy, Lee Smith, Joe Gurley, Steve Keen and County of Wayne for damages arising from her termination of employment. The defendants have filed three motions to dismiss, all of which have been fully briefed. For the reasons more fully stated below, the motions to dismiss are DENIED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Santifort initiated this action by filing a complaint in this court on December 5, 2014 [DE-1]. She filed an Amended Complaint [DE-4] later that same day. In the Amended Complaint, Santifort alleges she was terminated in violation of her First Amendment rights and wrongfully discharged in violation of public policy. The allegations, stated in the light most favorable to Santifort, show the following.

On July 31, 1991, Santifort was hired by the City of Goldsboro Fire Department as a full time Emergency Medical Technician (EMT) basic. Amend. Compl. [DE-4] ¶ 9. In 1992, she completed and passed her required advanced level of EMT-Intermediate. *Id.* ¶ 10.

In October 2012, Wayne County Emergency Medical Services ("EMS") took over the management of Goldsboro City EMS personnel. *Id.* ¶ 11. At some point prior to the official take over, it appears that the County began facilitating the pay of EMS personnel, because Santifort alleges that in May 2012, the County switched to a payroll system maintained by Ceridian, and "[t]here began to be widespread unrest amongst Wayne County EMS personnel concerning payroll issues . . . ." *Id.* ¶ 12. She contends that in June 2012, she began receiving emails and phone calls from co-workers about their problems with their paychecks. *Id.* ¶ 13.

On or about September 13, 2012, Santifort received a letter from Wayne County stating that she owed the County $2,630.68 due to an alleged overpayment in her paychecks for the months of July and August 2012. *Id.* ¶ 14. The letter informed Santifort that the then-County Manager, Defendant Lee Smith, had elected to forgive $200.00 of the total amount owed. *Id.* Santifort and other County EMS employees addressed their issues with the payroll system and overtime compensation to each superior in their chain of command. *Id.* ¶ 15.

On September 18, 2012, Santifort spoke at a County Commissioners meeting "on behalf of the County's EMS workers" and addressed "the problems with the payroll system and overtime compensation for the County's EMS workers." *Id.* ¶ 16. That same day, she received a letter signed by Smith and Defendant Sue Guy, then the Human Resources Manager for the County's Office of Emergency Medical Services ("OEMS"), thanking Santifort for attending the meeting, being a representative of Wayne EMS and other employees, and for "bringing the Commissioners information they did not know about." *Id.* ¶ 17. It is unclear from the Amended Complaint whether "they" refers to the Commissioners, or to Guy and Smith.

On September 17, 2012, Santifort met with OEMS staff members, who were advising her of what they and then-County Commissioner Steve Keen needed her to say at the next County

Commissioners meeting. *Id.* ¶ 19. At the end of the meeting, Defendant Joe Gurley told Santifort to "crucify" Smith at the next Commissioner's meeting. *Id.* Santifort then became concerned that "her desire to address the payroll and overtime compensation problems was being hijacked by Keen, Gurley and Guy to further their desire to get Smith fired as the County Manager." *Id.* Nevertheless, on October 2, 2012, Santifort again spoke at the Commissioner's meeting on behalf of the County's EMS employees regarding the payroll system and overtime compensation. *Id.* ¶ 20.

During this same time period, Santifort was under extreme stress from "trying to deal with Keen, Gurley, Smith, Guy, all her co-workers, and even employess that worked for other departments in Wayne County whom she had never met." *Id.* ¶ 22. Santifort contends these individuals "were all calling her with their demands, concerns, fears, [and] stories of being threatened by their supervisors if they got involved in the 'payroll issue.'" *Id.* Santifort alleges that this stress was compounded by a call she responded to in her job as an EMT, where the first responders suspected a child had died. Although Santifort and the other responders learned that no child had been injured, she maintains that the stress from the time she spent looking for the child's body "caused her to lose sleep, lose her appetite, and amplified the stress level already induced by the 'payroll issue.'" *Id.* 23.

Santifort's stress was such that she advised everyone she would not be attending the next Commissioner's meeting on December 3, 2012. *Id.* ¶ 24. Once she arrived at work on that date, however, she changed her mind and contacted her supervisor about attending the meeting. *Id.* Her supervisor agreed and arranged for coverage for Santifort.

Santifort was not able to speak at the meeting, however, because "the Commissioners refused to let any County EMS employee come to the microphone to speak." *Id.* ¶ 24. Following

the meeting, one of Santifort's co-workers fell ill in the OEMS parking lot, and Santifort held her while another co-worker retrieved her medication. *Id.* ¶ 26. While Santifort attended to her co-worker, Defendant Guy walked by them, laughing and smirking. *Id.* Santifort maintains the stress of the "payroll issues" overcame her, and she said to Guy: "Are you happy now, you stupid bitch, is this what you wanted?" *Id.*

The next day, Santifort sought medical help, and her physician wrote a note excusing her from work for a period of 30 days, with verbal instructions to not have any contact with anyone with the County EMS during those 30 days. *Id.* ¶ 27. Santifort delivered the note to her supervisor that day. *Id.* Later that evening, the supervisor called Santifort and told her that Smith needed Santifort to write a statement regarding what happened in the parking lot with Guy and to be in his office at 9:30 a.m. the following morning.

Santifort reported to Smith's office on December 5, 2012. When she arrived, Defendant Gurley, Smith, another County employee Blair Tyndall, and a note-taker were present. Instead of giving a statement, "Santifort was terminated, effective immediately, told that she was no longer allowed on any of the County's EMS property, and told that her things would be delivered to her." *Id.* ¶ 28. She was escorted from the office by two Wayne County Sheriff Deputies. *Id.* She later received permission to retrieve her belongings from work herself, provided that her supervisor and another Wayne County employee accompanied her the entire time. *Id.*

Santifort contends that the issues of payroll and overtime compensation were a matter of public concern, as evidenced by intense Commissioner's meetings about the subjects and rapt attention from local media outlets. *Id.* ¶ 25. She maintains that she "was used as a pawn by Gurley, Keen, and Guy to foment public unrest and negative attitude toward Smith in the hopes of accomplishing two things: (a) Stirring up enough backlash against the Democratically

controlled County Commissioners to help orchestrate a Republican takeover of that body in the November 2012 election; and (b) Thereby creating a Board of Commissioners that had the votes to oust Smith as County Manager." *Id.* ¶ 30. She contends that as of December 5, 2012, after the Republicans had taken over the County Commissioners, Defendants Gurley, Keen and Guy "no longer had any need for Santifort or to foment unrest regarding the County's 'payroll issue'" and "were looking for any reason to terminate Santifort to quell unrest on those issues." *Id.* ¶¶ 32-33. Santifort maintains that her emotional outburst toward Guy provided a pretextual reason for termination, and the real reason was to retaliated against her for her continued advocacy for a solution to the "payroll issue." *Id.* ¶¶ 34-35.

She asserts two claims under 42 U.S.C. § 1983, contending that all Defendants retaliated against her for expressing her views on a matter of public concern and advocacy in front of the County Commissioners, in violation of the First Amendment. She also asserts a wrongful discharge claim against Wayne County. All of the Defendants have moved to dismiss the claims asserted against them.

## II. STANDARD OF REVIEW

Rule 8(a)(2) of the Federal Rules of Civil Procedure provide that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Accordingly, a motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the sufficiency of a complaint, as governed by Rule 8. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In so doing, the court assumes the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, the "'[f]actual allegations must be enough to raise a right to relief above the

speculative level' and have 'enough facts to state a claim to relief that is plausible on its face.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (citing *Twombly*, 550 U.S. at 555 (2007)). Moreover, although the court draws all reasonable factual inferences in a plaintiff's favor, the court is not obligated to accept a complaint's legal conclusions drawn from the facts. *Iqbal*, 556 U.S. at 678. Nor must the court accept as true "unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 301-02 (4th Cir. 2008) (quotations omitted).

## III. DISCUSSION

All of the Defendants have filed motions to dismiss, which have overlapping arguments. All Defendants contend that Santifort has not stated a First Amendment retaliation claim. Specifically, Defendants argue that Santifort's speech and petitions were not protected by the First Amendment because they were not made in her capacity as a citizen and did not involve a matter of public concern. Defendants Guy and Smith also argue the claims must be dismissed because Santifort has not adequately alleged causation, and because they are entitled to qualified immunity.

### A. First Amendment Claims

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). Thus, to state a claim under § 1983, a plaintiff must allege facts showing the defendant violated "a right secured by the Constitution and laws of the United States" and that the deprivation of the right resulted from conduct "committed by a person acting under color of law." *West v. Atkins*, 487 U.S. 42, 48-49 (1988). Here, the Defendants do not contest, for purposes of the motion to dismiss, the

color of law requirement. Rather, the issue raised by the motions to dismiss is whether Santifort has adequately alleged that Defendants deprived her of rights secured by the First Amendment.

The First Amendment provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. The Fourteenth Amendment makes this prohibition applicable to the states. *See Fisher v. King*, 232 F.3d 391, 396 (4th Cir. 2000). Here, Santifort's claims implicate both the "Speech Clause" and the "Petition Clause."

As to the Speech Clause, the First Amendment protects both the freedom of speech, and also "the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). Thus, "[a] State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983). Accordingly, "a public employer contravenes a public employee's First Amendment rights when it discharges or 'refuses to rehire [the] employee' . . . based on the exercise of' that employee's free speech rights." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 316 (4th Cir. 2006)(quoting *Suarez Corp.*, 202 F.3d at 686.

Nevertheless, courts "evaluate the exercise of First Amendment rights by public employees differently from their exercise by other citizens; we must balance the interests of an employee who, as a citizen, comments upon matters of public concern, on the one hand, and the interests of a governmental employer, which must maintain an effective workplace, on the other." *Durham v. Jones*, 737 F.3d 291, 299 (4th Cir. 2013) (citing *Connick v. Myers*, 461 U.S. 138, 142 (1983)). When considering a retaliatory discharge claim, courts weigh these competing interests by asking three questions:

> (1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's protected speech was a substantial factor in the employee's adverse employment decision.

*Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560-61 (4th Cir. 2011) (quoting *McVey v. Stacy*, 157 F.3d 271, 277-78 (4th Cir. 1998)). The first two elements are question of law for the court; the last element, being one of causation, is one of fact. *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 352 (4th Cir. 2000).

Similarly, a public employee may bring a retaliation claim under the Petition Clause only if her petition was a matter of public concern. *Borough of Duryea v. Guarnieri*, ___ U.S. ___, 131 S. Ct. 2488, 2500 (2011). The Supreme Court has explained:

> If a public employee petitions as an employee on a matter of purely private concern, the employee's First Amendment interest must give way, as it does in speech cases. When a public employee petitions as a citizen on a matter of public concern, the employee's First Amendment interest must be balanced against the countervailing interest of the government in the effective and efficient management of its internal affairs. If that balance favors the public employee, the employee's First Amendment claim will be sustained. If the interference with the government's operations is such that the balance favors the employer, the employee's First Amendment claim will fail even though the petition is on a matter of public concern.

*Id.*

Accordingly, the threshold question under either a Petition Clause or Speech Clause claim is whether the plaintiff was addressing a matter of public concern as a citizen. With regard to this question, "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48; *see also Edwards v. City of Goldsboro*, 178 F.3d 231, 247 (4th Cir. 1999) (explaining that whether a public employee's speech touches on a matter of

public concern "rests on whether the public or the community is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a private matter between employer and employee" (internal quotation marks omitted)); *Stroman v. Colleton County Sch. Dist.*, 981 F.2d 152, 156 (4th Cir. 1992) ("Personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment, but are matters more immediately concerned with the self-interest of the speaker as employee"). Generally, speech "'involves a matter of public concern where it involves an issue of social, political, or other interest to a community.'" *Durham*, 737 F.3d at 300 (quoting *Kirby v. City of Elizabeth City*, 388 F.3d 440, 446 (4th Cir. 2004)). This inquiry does not turn on how "interesting" the subject matter of the speech is. *Vollette v. Watson*, Civil Action No. 2:12cv231, 2012 WL 3026360, at *7 (E.D. Va. July 24, 2012) (citing *Connick*, 461 U.S. at 147-48). And while the forum of the speech is not determinative of the question, it is relevant to the inquiry because "internal non-public comments are less likely to garner constitutional protection than publicly disseminated statements." *Id.* (citing *Guarnieri*, 131 S.Ct. at 2501). In total, the Fourth Circuit has made clear that whether an employee's speech concerns a matter of public concern is a case specific test that entails a "subtle, qualitative inquiry." *Goldstein*, 218 F.3d at 353.

Turning to the content of the speech and petition in this case, the court notes that the Amended Complaint does not provide much detail as to the actual substance of Santifort's remarks at the County Commissioner meetings, other than she spoke on behalf of Wayne County's EMS employees on the subject of "the problems with the payroll system and overtime compensation for County EMS workers" and "inequity being worked by the County's payroll issues." Amend. Compl. [DE-4] ¶¶ 16, 20. To be sure, Santifort was addressing an issue that

9
Case 4:14-cv-00225-F Document 34 Filed 09/08/15 Page 9 of 17

affected her personally; she had been informed that she was overpaid and would have to pay back over $2,000.00. *Id.* ¶ 14. Nevertheless, even if her personal grievance prompted her involvement, the subject matter of her statements may fairly be characterized as aiming "to bring to light actual or potential wrongdoing or breach of public trust" on the part of the County. *Connick*, 461 U.S. at 148-49; *see also Stroman*, 981 F.2d at 157-58 (recognizing that a teacher's comments "could be construed as another employee unhappy with a change in a pay practice, [but] might also reflect the complaint of a citizen concerned about budget mismanagement"). This is buttressed by the allegations that Santifort was speaking on behalf of *all* County EMS employees, and not just herself, and thus cannot be said to "convey no information at all other than the fact that a single employee is upset with the status quo." *Connick*, 461 U.S. at 148. Rather, the subject matter of Santifort's statements appears to address the operations and fiscal discipline of the County. Additionally, she alleges the Commissioners' meetings on the issues garnered local media attention.

As to the form and context of her statements, the court recognizes that the forum of the petition or speech is relevant to the question of whether the employee's activity relates to a matter of public concern, *Guarnieri*, 131 S.Ct. at 2501, but still "the right of a public employee 'to participate as a citizen, through petitioning activity, in the democratic process . . . is not a right to transform everyday employment disputes into matters for constitutional litigation in the federal courts.'" *Brooks v. Arthur*, 685 F.3d 367, 373 (4th Cir. 2012) (quoting *Guarnieri*, 131 S.Ct. at 2501). Here, Santifort spoke at a Board of County Commissioners meeting, and her comments before and during the meeting garnered enough attention that employees of other County departments contacted her about them. Amend.Compl. [DE-4] ¶ 22. The context and

form of her statements and petition, accordingly, cannot be said to be limited to an internal employee grievance.

Based on the court's foregoing, case-specific weighing of the content, form and context of Santifort's alleged statements and petition to the Board of County Commissioners, the court finds that at this stage of the proceedings, she has plausibly alleged that her speech was of public concern which implicated constitutional protection.

No Defendant contests the second factor of a retaliation claim under either the Petition or Speech clause. Some Defendants, however, appear to contest the third element of a claim, at least as applied to them in their individual capacities. Specifically, both Defendants Guy and Smith argue there are no allegations showing they were responsible for her termination.

As to Smith, the court notes that as a matter of state law, he had the authority to terminate Santifort's employment. *See* N.C. Gen. Stat. § 153A-82(1); *see also* 6A N.C. Index 4th § 35 ("In counties that have a county manager, the county manager is responsible for suspending or removing county officers, employees, and agents and is required to do so in accordance with any general personnel rules, regulations, policies, or ordinances that the board has adopted."). This, combined with the allegation that Santifort was terminated in Smith's office at a meeting he convened gives rise to the plausible inference that Smith terminated her employment. Smith makes much of the fact that Santifort has alleged that he signed a letter thanking her for her comments, and that she alleges that his ouster was the goal of the scheme by fellow Defendants Guy, Gurley and Keen. The fact that Smith thanked Santifort for her comments in September does not foreclose the idea that he may have preferred her not to speak; moreover, although the different Defendants may have had differing reasons for their desire to silence Santifort, it does not preclude the inference that Smith terminated Santifort in retaliation for her critical remarks at

11
Case 4:14-cv-00225-F   Document 34   Filed 09/08/15   Page 11 of 17

the County Commissioner meetings. Santifort will, of course, have to gather evidence to support these inference and contentions, but at this juncture her allegations are sufficient.

Guy similarly contends there are no factual allegations showing that she was involved in Santifort's termination, and accordingly the claims against her in her personal capacity must be dismissed. Under § 1983, "it must be affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (internal quotation and citation omitted). It is true that unlike Smith, there is no indication that Guy had the statutory authority to terminate Santifort's employment, nor are there allegations that she was present for Santifort's termination. Nevertheless, Santifort alleges that Guy, along with other defendants, used her as a pawn in a scheme to ultimately oust Smith as manager, and that once that scheme on its way to being accomplished, they had no further need of her. Santifort also alleges that two days after her outburst at Guy, she was terminated without giving a statement.

In another First Amendment retaliation case, the Fourth Circuit has observed that § 1983 "anticipates that a government official will be responsible for the natural consequences of his actions." *Tobey v. Jones*, 706 F.3d 379, 386 (4th Cir. 2013). In that case, the plaintiff sued Transportation Security Administration (TSA) agents for violating his First Amendment right to free speech after he was arrested for peacefully protesting a TSA screening measure. The TSA Agents lacked the official authority to arrest the plaintiff, but he alleged that the TSA Agents "radioed for assistance" and immediately thereafter, airport police arrived and seized and handcuffed him without further inquiry. *Id.* at The district court dismissed the complaint, stating that the compliant "doesn't say directly that [the plaintiff's arrest] was at the instruction of the TSA." *Id.* at 385 (alteration in original, citation and quotation marks omitted). The Fourth Circuit

reversed, noting that because "[i]t was an undoubtedly natural consequence of reporting a person to the police that the person will be arrested," "it [was] logical to assume that [the TSA agents] had a hand in his arrest." *Id.* Like in *Tobey*, the court here finds that Santifort has set forth allegations which render it plausible that Guy had a role in the termination. Taking Santifort's allegations as true, it is reasonable at this juncture to infer that Guy informed Smith of Santifort's outburst, and whatever she informed him may have led to his decision to terminate her employment. Moreover, given Santifort's allegations that Guy no longer had a use for Santifort's public advocacy regarding the payroll and overtime issues, it is reasonable to infer that Guy was motivated to advocate for Santifort's termination. Accordingly, the court cannot conclude at this time that Santifort has failed to state a claim against Guy in her individual capacity.

Finally, both Guy and Santifort contend that the claims against them in their individual capacity must be dismissed on the basis of qualified immunity. Qualified immunity provides government officials with immunity from suit for money damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable officer would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Scott v. Harris*, 550 U.S. 372, 377 (2007). Courts ruling on a claim of qualified immunity must consider two questions: (1) "whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right[,]" *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 169 (4th Cir. 2010); and (2) "whether the right was 'clearly established' in light of the specific context of the case." *Scott*, 550 U.S. at 377; *Jones v. Buchanan*, 325 F.3d 520, 526 (4th Cir. 2003). Both inquiries must be answered affirmatively before the court may deny qualified immunity. *Pearson*, 555 U.S. at

232, 235-36. A court has discretion which of the two questions to analyze first. *Id.* at 236. The plaintiff bears the burden of proof on the first inquiry and the defendant bears the burden of proof on the second. *Henry v. Purnell*, 501 F.3d 374, 377-78 (4th Cir. 2007).

In this case, Guy and Smith argue only that Santifort has not met her burden in alleging facts that make out a violation of a constitutional right. For the reasons the court already has discussed, the court disagrees, and finds that the record precludes a ruling on qualified immunity at this time. Moreover, neither Guy nor Smith proffer any argument as to why they have met *their* burden in showing that the right was not clearly established at the time of the incidents giving rise to this action. Accordingly, the motions to dismiss are denied on this basis.

B.   **Wrongful Discharge Claim**

The County moves to dismiss the North Carolina wrongful discharge claim asserted against it, arguing that Santifort has failed to allege that her discharge violated any express North Carolina policy.

Because this court has supplemental jurisdiction over this state-law claim, it applies state substantive principles and federal procedural rules. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-80 (1938); *Dixon v. Edwards*, 290 F.3d 699, 710 (4th Cir. 2002); *see also Artuso v. Vertex Pharmaceuticals, Inc.*, 637 F.3d 1, 5 (1st Cir. 2011) ("Pleading standards are one thing; substantive law is another. In a diversity case, pleading standards are a matter of law.").

As a general rule in North Carolina, an employee at-will has no claim for wrongful discharge; however, the employment at-will doctrine is not without limits and "a valid claim for relief exists for wrongful discharge of an employee at will if the contract is terminated for an unlawful reason or a purpose that contravenes public policy." *Tompkins v. Allen*, 107 N.C. App. 620, 622, 421 S.E.2d 176, 178 (1992). A plaintiff bears the burden of pleading that her dismissal

occurred for a reason that violates the public policy of North Carolina. *Salter v. E & J Healthcare, Inc.*, 155 N.C. App. 685, 693, 575 S.E.2d 46, 51 (2003). "Public policy" has been defined by North Carolina courts to mean "the principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good." *Coman v. Thomas Mfg. Co.*, 325 N.C. 172, 175 n.2, 381 S.E.2d 445, 447 n.2 (1989). Although there is no "laundry list of what is or is not 'injurious to the public or against the public good,' at the very least public policy is violated when an employee is fired in contravention of express policy declarations contained in the North Carolina General Statutes." *Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 353, 416 S.E.2d 166, 169 (1992) (footnote omitted). Accordingly, to allege a claim for wrongful discharge, a plaintiff should allege that a "defendant's conduct violated [an] explicit statutory or constitutional provision, [or] allege defendant encouraged plaintiff to violate [a] law that might result in potential harm to the public." *Considine v. Compass Group USA, Inc.*, 145 N.C. App. 314, 321, 551 S.E.2d 179, 184 (2001). Alternatively, a plaintiff may allege a termination violated one of the "exceptions to [the employment at will] doctrine grounded in considerations of public policy designed to prohibit status-based discrimination." *Kurtzman v. Applied Analytical Indus., Inc.*, 347 N.C. 329, 333-34, 493 S.E.2d 420, 423 (1997).

The North Carolina Supreme Court has not directly answered whether the provisions of the United States Constitution represent the public policy of the State of North Carolina. In *Coman,* where the North Carolina Supreme Court originally adopted the public policy exception to the general rule of at-will employment, the plaintiff alleged he was fired as a long-distance truck driver after refusing to falsify driving records, a violation of federal transportation regulations. *Id.* at 173-74, 381 S.E.2d at 446. The *Coman* court held that the actions violated the public policy of North Carolina as set out in certain state statutes that govern highway safety and

regulation. *Id.* at 175, 381 S.E.2d at 447. In so ruling, the *Coman* court expressly stated: "Although we do not bottom our opinion upon federal public policy, many courts have held that violations of federal public policy may form the basis for a wrongful discharge action in state courts." *Id.* at 178, 381 S.E.2d at 449. Thus, the North Carolina Supreme Court expressly left open the possibility that federal public policy *may* form the basis of a wrongful discharge claim.

Where the North Carolina Supreme Court has not spoken, this court must predict how the court would rule. *Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153, 1156 (4th Cir. 1992). In so doing, the decisions of North Carolina' intermediate appellate court, the North Carolina Court of Appeals, " 'constitute the next best indicia of what state law is,' although such decisions 'may be disregarded if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise.' " *Id.* (quoting 19 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4507 (1982)). Additionally, this court may consider "among other things, canons of construction, restatements of the law and treatises" and "well considered dicta" of the North Carolina Supreme Court. *Id.* In predicting how the Supreme Court of North Carolina would rule, the court may not create or expand North Carolina public policy. *See, e.g., Time-Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp.*, 506 F.3d 304, 314-15 (4th Cir. 2007).

Since *Coman*, numerous lower North Carolina courts and some federal district courts have stated that "[t]he public policy exception to the at-will employment doctrine is confined to the express statements contained within our General Statutes or our Constitution." *Whiting v. Wolfson Casing Corp.*, 173 N.C. App. 218, 222, 618 S.E.2d 750, 753 (2005); *see also Warren v. Smithfield Packing Co.*, No. 5:14-CV-71-D, 2014 WL 1691513, at *2 (E.D.N.C. Apr. 29, 2014) ("This court predicts that the Supreme Court of North Carolina would require a plaintiff claiming

wrongful discharge in violation of North Carolina public policy to allege 'specific conduct by a defendant that violated a specific expression of North Carolina public policy; in a specific North Carolina statute or a specific provision in the North Carolina Constitution in order to state a claim.'"). Indeed, in 1991, the Honorable W. Earl Britt in this district observed that "no North Carolina case has ever held that a wrongful discharge claim can be grounded on a violation of federal public policy." *Leach v. N. Telecom, Inc.*, 141 F.R.D. 420, 426 (E.D.N.C. 1991). This court has not identified any cases since 1991 that contradict Judge Britt's observation.

Again, the Fourth Circuit has counseled that when sitting in diversity or exercising supplemental jurisdiction over a claim, "a federal court 'should not create or expand [a] State's public policy.'" *Time-Warner*, 506 F.3d at 315 (quoting *St. Paul Fire & Marine Ins. Co. v. Jacboson*, 48 F.3d 778, 783 (4th Cir. 1995)). Accordingly, this court is constrained to find that a plaintiff may not ground a wrongful discharge on a violation of federal public policy, including the policy expressed in the Constitution. The County's Motion to Dismiss is ALLOWED as to the wrongful discharge claim.

## IV. CONCLUSION

For the foregoing reasons, the Motions to Dismiss [DE-17, 26] are DENIED. The Motion to Dismiss [DE-12] filed by Defendants County of Wayne, Joe Gurley, and Steve Keen is DENIED as to the § 1983 claims and ALLOWED as to wrongful discharge claim. The Clerk of Court is DIRECTED to continue the management of this case.

SO ORDERED. This the 5* day of September, 2015.

James C. Fox
Senior United States District Judge